# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| TIMOTHY W. WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 15-CV-867-SMY-RJD |
| | ) | |
| CENTRAL CONTRACTING & MARINE, | ) | |
| INC. and M/V STACEY DIANNE, in rem, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiff Timothy W. Williams filed this action against his employer, Central Contracting and Marine, Inc. ("CCM") pursuant to the Merchant Marine Act of 1920 (commonly known as the "Jones Act"), 46 U.S.C. § 30104, and the general maritime law, arising from injuries he sustained while working on one of CCM's vessels. Plaintiff designated this matter as an admiralty or maritime case under Federal Rule of Civil Procedure 9(h). The Court conducted a three-day bench trial (Docs. 67-69) and now makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a).

### FINDINGS OF FACTS

#### *Prior Injuries and Treatment*

Williams had a history of back problems before his employment with CCM and made at least two prior claims for back injuries suffered at work—one in the mid-1990s against Anchor Moving and Storage, and one Lewis and Clark Fleeting in approximately 1999. (Tr. Vol. II at page 285 line 24 through page 286 line 15). In the 1999 incident, Williams claimed that he injured his back jerking a ratchet. (Tr. Vol. II at page 286 lines 16-22).

Williams saw Dr. Robert Bernardi, M.D., a spinal neurosurgeon on February 27, 2008

after falling from his truck at work the prior month. (P. Ex. 51 at 2-3). He underwent an MRI which showed degenerative disc changes at L3-L4, L4-L5 and L5-S1 in his lower back, as well as a small central disc protrusion at L4-L5. (*Id.* at 2). Dr. Bernardi prescribed pain medication and physical therapy, and indicated that he did not believe surgery was an option. (*Id.* at 3). Williams saw Dr. Bernardi for a follow-up appointment on March 26, 2008, during which he recommended to Williams that he find light duty work to transition back to regular duty, but that if light duty was not available, he would need to "decide whether he wants to try returning to regular duty work or whether he wants to see[k] out other types of employment which might be less strenuous on his back." (*Id.* at 4). Dr. Bernardi subsequently wrote a return to work slip for Williams. In his opinion, the January 2008 injury was not associated with any permanent disability. (*Id.* at 5).

Williams understood Dr. Bernardi's statements to mean that he was able to resume regular if he felt good enough to go back, and that he was not disabled. (Tr. Vol. II page 259 lines 2-10). Williams filed a workers compensation claim against his employer, which settled with a determination that he suffered an 11% total body disability due to his back injury. (Defendant's Exhibit 7).

In 2011, Williams applied for disability benefits from the Social Security Administration. In his Function Report, Williams represented that his back injury affected his ability to lift, bend and sit, and that his "back is pretty much shot from all the hard jobs I've had over the years." (Tr. Vol. II page 298 line 14 through page 299 line 14).

There are also records of clinic visits from Dr. Nilima Chand in evidence during which Williams complained of back pain prior to October 2014. Specifically On June 5, 2014, Williams presented with back pain caused by reaching down to pick up a tarp. (D. Ex. 25). He was given Flexeril and Predinsone. (*Id.*). On June 21, 2014, he again presented to Dr. Nilima

Chand complaining that he "popped his lower back last week," that his neck had been in spasm since then, that he had severe pain moving side to side and that the pain was radiating to his upper and lower back. (D. Ex. 26). She found that although Williams had spasm of the muscles in the lower spine, he was not in severe pain. (Deposition of Dr. Nilima Chand page 10 lines 18-24). On physical exam, she noted that straight leg raising was negative, that his motor exam showed normal strength and he had a normal neurological examination. (Nilima Chand Dep. page 11 line 19 through page 12 line 10 and page 19 line 21 through page 20 line 5). She was prescribed Flexeril and a Medrol dosepak. (D. Ex. 26). Neither the June 5, 2014 nor the June 24, 2014 records reflect any activity restrictions.

Williams also testified regarding his history of painkiller addiction, peaking in 2011 and ending with treatment in 2012. (Tr. Vol. II page 260 line 22 through page 264 line 4). At the time of the accident in question, Williams was taking Suboxone as part of his recovery. (Tr. Vol. II page 265 line 24 through page 266 line 15).

### *CCM Employment and the Accident*

CCM hired Williams on October 17, 2014. (Final Pretrial Order ("FPO") Section IV—Stipulated Facts). Williams testified that CCM did not ask any questions regarding his health or physical condition before hiring him (Trial Transcript Volume II, Doc. 68, page 207 lines 13-18). He believed that he was physically capable of performing the work of a deckhand and he was not under any disability at that time. (Tr. Vol. II, page 265 lines 17-23).

Defendant's office manager, Tiffany Jackson, acknowledged that CCM did not require Williams to complete a job application, did not question Williams about his medical history before hiring him and did not require that he submit to a pre-employment physical examination. (Deposition of Tiffany Jackson page 8 line 13 through page 9 line 15; page 26 lines 10-16; page 8 line 18 to page 9 line 15). CCM admitted did not seek any information concerning Williams'

physical condition or medical history before he was injured. (Tr. Vol. III page 322 lines 19-22).

Before working for CCM, Williams had worked as a deckhand for Lewis & Clark Fleeting on a harbor boat in the St. Louis, Missouri harbor. He had also worked as a mate on various line boats that would push barges on the Upper Mississippi River in his late teens and early twenties (FPO, Section IV). This work included "basic tow work," which Williams described as rigging, ratchets, wiring straps and wiring barges together. (Tr. Vol. II, page 210 lines 8-14).

Upon being hired by CCM, the only safety rules Williams was given was a sheet entitled "Central Contracting & Marine, Inc. Safety Rules" which listed safety rules more applicable to the dockside plant than to activities on a boat. (Tr. Vol. II page 212 line 19 through page 214 line 8; P. Ex. 118). His training consisted of three days following another deckhand on board the M/V Stacey Dianne while performing tow work. (Tr. Vol. II page 215 line 19 through page page 216 line 2). According to Williams, there were no safety meetings during his time with CCM, and the deckhand training him did not instruct him on inspection and selection of rigging, laying wires or reporting accidents. (Tr. Vol II at page 216 lines 3-20).

Williams testified that on October 20, 2014, he received a text message from CCM asking if he would like to work that evening by himself, to which he replied that he would. (Tr. Vol. II, page 217 lines 4-24; P. Ex. 9). He agreed to do it because he was new at the company and assumed that it would be a light duty night. (Tr. Vol. II page 218 lines 18-24). That night, his work included tying barges together with rigging, ratchets and steel wires. (Tr. Vol. II page 220 line 8 to page 221 line 10). Based on his prior experiences, Williams remembered how to lay a wire and tighten it with a ratchet; but that it had been 14 years since he had done so. (Tr. Vol. II page 303 line 15 through page 304 line 1). He completed his work on October 20, 2014 without incident. (Tr. Vol. II page 221 lines 16-20).

Williams worked the deck alone again on October 22, 2014. (Tr. Vol. II page 222 lines 9-11). As he was attempting to tie together two barges using steel wires, he hooked a ratchet onto a wire in preparation to take up any slack. (Tr. Vol. II page 228 lines 1-7). When Williams "jerked" the ratchet to take up the slack, the wire slipped off a deck fitting (known as a "button") that it was looped around. (Tr. Vol. II page 228 lines 5-11). As a result, Williams was thrown off-balance and fell. (Tr. Vol. II page 239 lines 3-16).

Williams testified that the condition of the 35-foot pieces of wire or cable rigging kept on the boat was not "the best" – they appeared rusty and well-used. (Tr. Vol. II page 229 lines 5-18). He did not see any kinks (sometimes referred to as "a-holes") in the wire before his fall, but believes there must have been one in order for the wire to jump off the button fitting. (Tr. Vol. II page 238 line 11 to page 239 line 5).

Mike Duncan, the boat's pilot, came down to check on him, but did not ask him to fill out an accident report. (Tr. Vol. II page 239 line 18 through page 240 line 2). Williams continued his shift with some help from the Duncan. He asked Duncan if he needed to fill out an accident report, to which Duncan replied that they would talk about it later. (Tr. Vol. II page 240 lines 20-21; page 241 lines 13-21; page 310 lines 7 through 16).[1]

The following day, Williams sent a text to his contact at CCM stating that he had hurt his back jerking up a ratchet, could hardly get out of bed and was not going to be able to work for a day or two. (Tr. Vol. II page 242 lines 4-20; P. Ex. 9). He received no response. (Tr. Vol. II page 242 lines 21-22). Williams visited Parkland Health Center's emergency department that evening, complaining of pain in his left hand, right shoulder, and lower back. He also reported that he had hit his head. (P. Ex. 119 at 7).

Tiffany Jackson, CCM's office manager, contacted Williams on October 24, 2014 via

---

[1] Duncan, for his part, testified that Williams never reported an accident, that he did not witness Williams have an accident and did not observe Williams in pain, though he did help him lay a wire late in the day. (Deposition of Michael Duncan at page 55 line 8 through page 56 line 15).

text message. (Tr. Vol. II page 245 lines 3-14; P. Ex. 8). She told Williams that CCM could take care of "his medical," but that it needed an injury report and post-accident drug test. (P. Ex. 8). Williams and Jackson exchanged texts in an attempt to arrange a meeting at an emergency room, but the meeting never took place. (Tr. Vol. II page 245 line 17 through page 246 line 3). Williams testified that by that point, he no longer trusted the company and that the lawyer he had consulted told him not to communicate with CCM. (Tr. Vol. II page 246 lines 4-14).

During trial, Williams admitted, without objection, 3 photographs (P. Ex. 12-14) showing bruising on his left groin, thigh and thumb. Williams testified that he took the pictures a few days after the accident. (Tr. Vol. II at page 247 lines 6-24).

CCM filed a Marine Casualty form (CG-2692) dated January 8, 2016 and signed by Tiffany Jackson with the Coast Guard. (P. Ex. 15). The form states, "Williams reported he hurt his back while jerking slack out of a ratchet on October 22, 2014. He did not fill out an accident report and no further details were provided." *Id.* at 2.

David Brown, CCM's President, was deposed as CCM's Rule 30(b)(6) corporate representative. (Deposition of David Brown at page 6 line 22 through page 7 line 11; page 11 lines 1-8). According to Brown, CCM knew about Williams' injury on October 23, 2014, the day after the incident. (*Id.* at page 91 lines 13-21). After being made aware of the claimed injury, the company began an investigation by talking to Mike Duncan, and notified its insurance company of the claim. (*Id.* at page 91 line 22 through page 92 line 12).

### *Maintenance and Cure*

On November 20, 2014, CCM's counsel Daryl Sohn drafted a letter (apparently in response to a demand from an attorney in New Orleans) stating that Williams was "not eligible for any disability insurance when he stopped communicating with CCM." (D. Ex. 49). The letter indicated that CCM might be willing to pay for medical treatment directly if Williams

would cooperate in its investigation of the incident.  (*Id.*)

On December 29, 2014, Williams' attorney, Sean Lieser, sent a demand letter to Sohn, requesting immediate payment of maintenance benefits.  (P. Ex. 115).  Sohn responded on December 31, 2014, stating that he had heard nothing in response to his prior letter, and that in order to investigate the maintenance claim, CCM still needed an interview with Williams, the name of any doctor Williams had seen, and a HIPAA release for medical records.  He also requested information regarding Williams' grocery and housing costs for the calculation of maintenance.  (D. Ex. 50).  Lieser responded that he was gathering the bills and HIPAA authorization and named four medical providers.   (P. Ex. 116).  He offered to arrange for Williams to make a statement, and requested an opportunity to meet with the human resources manager and Williams' supervisor.  (*Id.*).

On January 16, 2015, Lieser sent Sohn a HIPAA authorization for the release of records from October 22, 2014 onward related to Williams' back, shoulders and left hand/thumb.  (P. Ex. 117).  Sohn responded that CCM needed a release for medical records going back farther in order to investigate whether Williams had a preexisting back injury.  (D. Ex. 52).  Sohn sent Lieser additional letters on February 5, 2015, February 6, 2015, and March 11, 2015, forwarding copies of medical records they received from after the date of the accident and again requesting the living expense information and the HIPAA release for earlier periods.  (D. Ex. 53, 54, 55).

On March 25, 2015, Sohn wrote to Lieser enclosing the final post-accident medical records and stating that CCM would pay for the treatment reflected in those records.  (D. Ex. 56).  Sohn also indicated that the full investigation was not yet complete, as they did not have a records release for Williams' family doctor, had not had a chance to interview Williams, and had not received the living expense information needed to calculate maintenance.  (*Id.*)

CCM's counsel followed up with several letters, including one from May 13, 2015

requesting a records release for Drs. Chand and Gornet, stating that CCM "is not going to be in a position to pay any medical bills until we get this," and inquiring about interviewing Williams and the living expense information. (D. Ex. 59). A similar letter was sent to Lieser on June 30, 2015, stating that CCM had not had the chance to interview Williams, had not received the wider HIPAA release, had not received photos of Williams's injuries referenced in a medical report, and had not received the bills it needed to calculate maintenance. (D. Ex. 60).

Sohn e-mailed Williams' present counsel, Roy Dripps, on September 9, 2015 asking for the same documents and information. (D. Ex. 61). On September 25, 2015, Sohn sent a letter to Dripps stating that based on representations that the wider HIPAA release was forthcoming, CCM would begin paying maintenance and cure. (D. Ex. 48). Sohn references a letter from Dripps dated September 11, 2015 in which he sets forth an itemization of Williams's maintenance expenses. (*Id.*).

CCM began paying the medical expenses on October 8, 2015 and maintenance on November 24, 2015. (D. Ex. 45 and 46). In total, CCM paid maintenance to Williams for the period beginning the date of his alleged injury until he reached maximum cure, in the amount of $26,327.99 (an amount agreed to by the parties). (D. Ex.'s 44, 45). They also paid medical expenses totaling $182,658.78. (D. Ex.'s 46, 47).

Williams asserts that he is still owed $216,227.55 in medical bills for cure. (P. Ex. 99-111). David Brown had no knowledge of or explanation for CCM's failure to pay these bills. (Brown Dep. page 86 line 18 through page 87 line 6).

## *Liability Experts*

### J. Patrick Jamison

Williams presented J. Patrick Jamison as an expert witness. (Tr. Vol. I page 42). Jamison is a "semi-retired riverboat captain" with extensive experience. (Tr. Vol. I page 42 line

22 through page 44 line 17). He testified that two deckhands are the normal crew complement on tugboat on the upper Mississippi River in the area where the Stacy Dianne was operating on the day of the incident (Tr. Vol. I page 51 line 24 through page 52 line 5). He explained that when laying wire which may have a kink in it, a second deckhand can put a foot on the button to maintain tension and keep a kinked line from jumping off the button when ratcheting it tight. (Tr. Vol. I page 55 line 10 through page 56 line 1).

According to Jamison, the use of a second deckhand is a "safety standard" to keep the line from coming off and causing damage. (Tr. Vol. I page 56 line 19 through page 57 line 3). This safety standard is one generally observed by inland river towing companies in situations similar to the one at issue in this case. In his opinion, while using a single deckhand is something that "is done every day," it is not standard practice. (Tr. Vol. I page 57 line 4-13; page 73 lines 6-12). Although a pilot could help out a deckhand laying a wire by leaving his station and going on deck, it is "not a good…practice" because it leaves no one at the controls. (Tr. Vol. I page 59 line 1 through page 60 line 6). In his opinion, the lack of second deckhand caused or contributed to cause the accident; a second properly-trained deckhand would have been able to prevent the incident by keeping the wire from jumping off the button. (Tr. Vol. I page 60 lines 11-19).

Jamison also testified that while someone will mostly notice a kink in a wire before laying it, that is not always the case. (Tr. Vol. I page 61 lines 13-19). He would "not expect that wire to jump off with the procedure [Williams] was trying to accomplish" if there was no kink in the wire. (Tr. Vol. I page 61 lines 7-12). He also suggested that there is no safe way for a single deckhand to jerk a kink out with a ratchet. (Tr. Vol. I page 62 lines 5-9).

**Robert Peyman**

CCM presented expert testimony from Robert Peyman, a ferry operator with extensive

experience working with tow barges and rigging.  (Tr. Vol. II Page 335 line 8-21).   In his opinion, between his prior experience and working with a CCM deckhand for several shifts, Williams had sufficient training and experience to do the job he was performing at the time of the injury.  (Tr. Vol. II page 343 line 23 through page 344 line 3).   It's also his opinion that the work being performed on the *Stacey Dianne* does not require more than a single deckhand.  (Tr. Vol. II page 344 lines 4-14 and page ).   Moreover, it was reasonably safe for the *Stacey Dianne* to operate with a single deckhand on the date of the accident based on the conditions and amount of activity at the time.  (Tr. Vol. II page 346 line 18 through page 347 line 8).   His opinion is also based on the volume of work the vessel did in October 2014 in terms of numbers of barges moved.  (Tr. Vol. II page 344 line 16 through page 345 line 13).

Peyman offered the further opinion that it was reasonably safe for a single deckhand to lay and tighten a wire like Williams was doing when he was injured and that it is routinely done.  (Tr. Vol. II page 347 line 16 through page 349 line 2).   He stated that any kink in the line would have been "pretty obvious," and listed several ways to deal with a kinked line (including, asking for help with it).  (Tr. Vol II page 350 lines 5-23).   Peyman testified that a second deckhand would not have made any difference, although his rationale for this opinion was that other crewmembers would be "off doing something else."  (Tr. Vol. II page 351 lines 9-22).

On cross examination, Peyman testified that he did not find any fault with Williams.  (Tr. Vol. II page 352 lines 19-24).   He also testified that if a company does not train an employee or adopt safety rules for the task it assigns him, the company would be at fault.  He agreed that it is "imperative" that a company provide adequate rules, procedures and training to identify and prevent rigging hazards.  (Tr. Vol. II page 365 lines 7-20; page 370 lines 15-20).

The Court finds Jamison's opinions regarding the standards for safe conduct of tow-rigging in situations like those involved in the present case more credible and persuasive than

those of Peyman.  Specifically, the Court finds that the generally observed safe practices for laying and tightening wire in situations like that aboard the *Stacy Dianne* on October 22, 2014 required two deckhands working together – one jerking on the ratchet with the other placing his foot on the button to keep any kinks from causing the cable to slip off.

The Court further finds that the rules, procedures and training CCM provided to Williams were inadequate to ensure safe performance of the tasks he was asked to perform.  Although Williams had prior experience as a deckhand performing this type of work, CCM was aware that it had been 14 years since he had last done so.  A single sheet of "safety rules" mostly inapplicable to activities on the boat and three shifts shadowing another deckhand were simply insufficient to ensure that Williams could safely perform the tasks assigned to him by CCM. This is especially true in light of the importance CCM's own retained expert ascribed to having adequate rules and training for deckhands regarding recognizing and addressing rigging hazards.

### *Medical Evidence*

**Dr. Nathan Mall**

On November 12, 2014, Williams was treated by Dr. Nathan Mall, an orthopedic surgeon.  (P. Ex. 22 at 1).  He explained the accident and reported that he had difficulty raising his arm overhead and pain in the center of his lumbar spine.  *Id.*  Dr. Mall noted, "[Williams] can resist me somewhat with his rotator cuff testing in the supraspinatus distribution, however, this is quite painful for him.  He actually came to tears during the examination due to pain in the shoulder."  *Id.*  Dr. Mall diagnosed a right shoulder contusion, possible rotator cuff tear, lumbar spine strain, and possible disc herniation.  (*Id.*, p. 3).  He restricted Williams from floor to waist lifting over ten pounds.  (Deposition of Dr. Nathan Mall page 11 lines 9-16).

Dr. Mall ordered an MRI of Williams' his right shoulder which showed mild partial tearing of his rotator cuff and a tear of the supralabrum.  (*Id.* at page 11 line 17 through page 12

line 1).  The shoulder issue had resolved by July 18, 2016 (the time of Dr. Mall's deposition). (*Id.* at page 24 lines 13-15).

Dr. Mall also ordered an MRI of Williams' lumbar spine, which was conducted on December 22, 2014.  (P. Ex. 24).  The MRI showed an L4-L5 broad-based disc herniation, and a broad-based disc protrusion with focal central disc herniation with facet arthropathy contributing to bilateral mild foraminal stenosis at L5-S1.  (*Id.*).

Dr. Mall also noted that Williams complained about an injury on the inside of his left thigh, which he diagnosed as a torn adductor muscle.  (*Id.* at page 16 lines 11-20).  An MRI showed muscle retraction and continued edema within the muscle which appeared as swelling and fluid.  (*Id.* at page 18 lines 13-20).  In Dr. Mall's opinion, the torn adductor muscle appeared to be related to Williams' work injury.  (*Id.* at page 20 line 22 through page 21 line 12).

Following a course of physical therapy, Dr. Mall performed surgery on the adductor on April 21, 2016.  (*Id.* at page 22 line 11 through page 23 line 12.  Williams reported marked improvement in his thigh by May 2016 and has no restrictions or further medical issues with his adductor.  (*Id.* at page 23 line 24 through page 24 12 and page 52 at lines 11-22).

**Dr. Matthew Gornet**

Williams was referred to Dr. Matthew Gornet for treatment of his back issues.  At his initial visit on February 10, 2015, he presented with "a chief complaint of central low back pain to the right buttock, hip and down the right leg to his knee with tingling intermittently in his right leg" which he ascribed to the October 22, 2014 accident.   (P. Ex. 39 at 1).   Dr. Gornet noted "obvious spasm" on physical examination, and that straight leg raising produced "significant pain" at 45 degrees.  (*Id.* at 1-2).  Dr. Gornet's review of the December 22, 2014 MRI revealed "significant extruded central disc herniation at the L4-5 level" and "smaller tears at both L3-4

and L5-S1." (*Id.* at 2). On April 1, 2015, Dr. Gornet performed a discogram on Williams with a pain assessment of "6 to 7 on a scale of 10 of pain" at L5-S1 and "8 to 9" at L4-5. (*Id.* at 6).

Dr. Gornet performed an anterior decompression at L3-4, L4-5 and L5-S1, a disc replacement at L3-4 and L4-5 and an anterior lumbar fusion at L5-S1 with LT cages and crushed cancellous allograft on June 30, 2015 (P. Ex. 39 at 10). A CT scan perfomed on September 16, 2015 noted that "[n]o residual central canal stenosis is observed at any of these three levels. There is no residual foraminal stenosis." (P. Ex. 39 at 16).

Dr. Gornet released Williams to work on February 8, 2016, with restrictions for "light duty" involving no lifting greater than 25 pounds, the ability to alternate between sitting and standing as needed, no repetitive bending, and no repetitive lifting. (P. Ex. 39 at 28). According Dr. Gornet, by July 2016, Williams "felt substantial pain relief as long as he stayed in sort of a sweet spot of area." (Deposition of Dr. Matthew Gornet page 18 lines 15-16). On Williams' January 19, 2017 appointment, Dr. Gornet noted "[h]e continues to do well. He is very pleased with his progress, as long as he stays within his restrictions." (P. Ex. 52 at 2).

In Dr. Gornet's opinion, the symptoms and conditions he observed were related to the October 22, 2014 accident. However, he testified that because "he did not have any previous problems of significance with his back that he could at least recall at the time, there is no other plausible explanation than to associate that event with his complaints, his physical exam, and the objective findings." (Gornet Dep. page 12 lines 7-22). At trial, Williams admitted that he had not told Gornet about his history of back injuries and issues described above. (Tr. Vol. II page 260 lines 7-12). That said, Dr. Gornet was questioned about the 2008 injury and Dr. Bernardi's records, so he was at least aware of the prior condition of Williams's spine. (Gornet Dep. page 22 line 3 through page 24 line 20).

Some of the functional restrictions have been made permanent by Dr. Gornet, including no lifting over 35 pounds and no repetitive bending. (P. Ex. 52 at 2). Additionally, Dr. Gornet noted that Williams is "at increased risk with time for future surgery" and at increased risk to develop problems in his joints at the affected levels. (Gornet Dep. page 19 lines 12-23).

**Dr. Sunil Chand**

Dr. Sunil Chand is Williams' primary care doctor, treating him for diabetes, hypertension and opiate addiction. (Tr. Vol. I page 92 lines 2-7). He had been treating Williams with a drug called Suboxone to aid him in recovery from a long-term opioid addiction prior to the accident at issue in this case. (Tr. Vol. I page 99 lines 14-16). He testified that he adjusted Williams' Suboxone as a way to help him live with his pain and avoid taking opiates. (Tr. Vol. I page 108 line 21 through page 109 line 15). When asked about Williams' prognosis, Dr. Chand testified that "his pain, back pain issues will require a chronic dose of Suboxone for him lifelong, along with his therapies." (Tr. Vol I page 148 lines 10-14).

**Dr. Sherwyn Wayne**

CCM presented Dr. Sherwyn Wayne as an expert witness. Dr. Wayne did not examine Williams or speak to him. (Deposition of Dr. Sherwyn Wayne page 29 lines 18-23; page 30 lines 6-11). He reviewed Williams' medical records and diagnostic studies and formed an opinion that the back issues present after 2014 were not caused by the accident, but were a progression of the conditions found present in Williams' spine in 2008. (Wayne Dep. page 22 line 16 through page 23 line 1).

"In a case of dueling experts … it is left to the trier of fact…to decide how to weigh the competing expert testimony." *Morisch v. United States*, 653 F.3d 522, 529 (7th Cir. 2011) (quoting *Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008)). The Court finds Dr. Mall's opinions regarding the severity and causation of Williams' shoulder and adductor injuries to be

credible. The Court further finds that the opinions of Dr. Matthew Gornet are more persuasive as to the severity and causation of Williams' back injuries than those of Dr. Sherwyn Wayne. Dr. Gornet, as Williams' treating physician, had the opportunity to personally evaluate and interact with Williams and his opinions were more consistent with the medical record as a whole. The Court also accepts Dr. Sunil Chand's prognosis that Williams will likely continue to take Suboxone for the foreseeable future.

### *Current Condition*

Williams' thumb injury resolved on its own before he saw a specialist. (Tr. Vol. II page 316 lines 11-15). His back pain had largely been relieved by the time of trial by the surgery performed by Dr. Gornet. (Tr. Vol. II page 316 lines 16-22). Williams describes his current shoulder problem as "stiffness" rather than pain, and that he tries to "stretch it out the best I can." Tr. 253:20-254:4. When asked whether he still experiences back pain, Williams alternately answered "not really, no, I don't" and "from time to time, yes." (Tr. Vol. II page 254 lines 5-6 and 16-18).

### *Employment*

At the time of trial, Williams was training to be a drug and alcohol counselor. (Tr. Vol. II page 269 line 2-15). When asked how much money he might make in that position, Williams testified that it varied between $10 and $25 per hour. (Tr. Vol. II page 269 line 23 through page 270 line 3). Dr. Sunil Chand, the doctor managing Williams's addiction issues, is also supervising him in his training to be a counselor. (Tr. Vol. I page 125 line 22 through page 126 line 8). Dr. Chand was very positive about Williams' efforts and progress in his training, and agreed that if he becomes a licensed drug counselor, it would (at some point) be a full-time job. (Tr. Vol. I page 126 line 24 to page 127 line 24).

## *Other Activities*

Williams testified that because of the groin injury from the accident, he could no longer ride his motorcycle and was forced to sell it. (Tr. Vol. II page 270 line 13 through page 272 line 8). At the time of trial, he did not have a driver's license. He could walk a mile, do light duty home and car repairs (including laying tile), do some cleaning and carry groceries. (Tr. Vol. II page 272 line 20 through page 274 line 22; page 317 lines 2-16).

## *Economic and Vocational Expert Testimony*

### Dr. Rebecca Summary

Dr. Rebecca Summary, a professor of economics at Southeastern Missouri State University, testified as an expert witness regarding Williams' alleged economic losses. (Tr. Vol. I page 156 lines 3-8). Dr. Summary calculated Williams' earning capacity as $36,400 per year in 2015, based on a $200/day prevailing rate at the time of his injury, and $37,128 for 2016, based on a 2% increase for inflation. (Tr. Vol. I page 159 line 13 through page 160 line 2). She calculated Williams's total past losses from October 22, 2014 through May 31, 2016 as follows: $87,727 in lost wages; $11,863 in lost fringe benefits; and "lost household services" of $9,783. (Tr. Vol. I page 164 lines 8-14). The "lost household services" was calculated from an unidentified "economics firm in Kansas City" that takes the "American Time Use Survey" and for different categories of people (single male, married male, etc.) provides "what the value of their household services would be[.]" (Tr. Vol. I pages 164 line 15 through page 165 line 18).

Dr. Summary calculated the present value of Williams' future wages as an after-tax amount of $562,490, fringe benefits of $147,529 and lost household services was $196,901. (Tr. Vol. I page 165 line 22 through page 166 line 7; page 169 lines 16-18). She also provided

calculations assuming Williams' ability to work a minimum-wage job,[2] giving a present value of his future wage loss as $298,582, plus future lost fringe benefits (assuming small fringe benefits typically associated with minimum-wage positions) of $131,167 and future lost household services of $196,901. (Tr. Vol I page 168 line 3 through page 169 line 18).

Dr. Summary did not calculate the difference in future wages and fringe benefits between continued employment with CCM and Williams's desired job of drug and alcohol counselor. Further, her calculation of Williams' lost household services was not done with any reference to what household services Williams can actually perform. (Tr. Vol. I page 173 at 20 through page 174 line 9).

**Timothy Kaver**

Defendant presented expert testimony from vocational rehabilitation counselor Timothy Kaver. (Tr. Vol. II page 183 line 21 to page 184 line 14). Kaver performed an evaluation of the jobs that would be available to Williams in light of the restrictions imposed by Dr. Gornet. (Tr. Vol. II page 186 line 23 through page 187 line 8)-9; 23-187:3.

In Kaver's opinion, "returning to work as a truck driver would provide [Williams] with the wisest use of his transferable skills, since he's done it for years, prior to working for the barge line." (Tr. Vol. II page 189 lines 13-21). He acknowledged, that the Dictionary of Occupational Titles classifies truck drivers as "a medium job, which means you need to lift 50 pounds to do that job," but stated that "in reality, it's— for most employers, it's a light duty position." (Tr. Vol. II page 191 lines 4-13).[3] Kaver testified that the entry-level wage for tractor-trailer drivers in Missouri is $29,485. (Tr. Vol. II page 191 line 24 through page 192 line

---

[2] Dr. Summary did not identify the minimum wage number she used in her calculations. The Court takes judicial notice that in 2015 and 2016, the Missouri minimum wage was $7.65 per hour, per the Missouri Department of Labor. https://labor.mo.gov/DLS/MinimumWage.

[3] In addition to the potential duty-level mismatch, Kaver also acknowledged a potential problem with a Suboxone user obtaining the Commercial Driver's License required to drive a tractor-trailer. (Tr. Vol. II page 196 line 6 through page 197 line 19; page 203 line 15 through page 204 line 18).

8).  With respect to other jobs that he opined Williams could perform, the compensation generally ranges from minimum wage to $12 per hour, yielding annual wages of $15,912 to $24,960.  (Tr. Vol. II page 192 lines 9-14).  According to Kaver, these other jobs generally will provide health insurance and vacation pay if they are full-time.  (Tr. Vol. II page 198 line 15-19).

The Court finds Dr. Summary's testimony credible, and accepts her calculation of past lost wages and past fringe benefits in determining damages.  As to future wages, the Court finds that Williams is capable of gainful employment at the $10-25 per hour projected income for his intended occupation of drug counseling.  Dr. Summary's calculation of lost household services, which assumes that Williams is unable to perform household services, despite his testimony as to the wide range of functions he can perform around the house, is not well supported and will be disregarded.

<h2 style="text-align:center"><u>CONCLUSIONS OF LAW</u></h2>

Williams filed a four-Count Complaint in this Court; one Count was later dismissed by stipulation.  (Docs. 1, 31, 32).  The remaining Counts assert a Jones Act claim, unseaworthiness and failure to pay maintenance and cure.

<h3 style="text-align:center">The Jones Act</h3>

Under the Jones Act, "a seaman injured in the course of employment ... may elect to bring a civil action at law, with the right of trial by jury, against the employer."  46 U.S.C. § 30104 (formerly codified at 46 U.S.C. app. § 688(a)).  "Congress enacted the Jones Act to create a federal negligence claim for seamen injured in the course of employment."  *Sobieski v. Ispat Island, Inc.*, 413 F.3d 628, 631 (7th Cir. 2005).  "The act by its terms extends the protections of the Federal Employer's Liability Act ("FELA") to seamen, and thus FELA caselaw is broadly applicable in the Jones Act context."  *Id.*

An employer's duties under FELA (and so by extension the Jones Act) include the duties "to provide employees a reasonably safe workplace, safe equipment, proper training, and suitable methods to perform the assigned work." *Lynch v. NE Regional Commuter RR Corp.*, 700 F.3d 906, 912-913 (7th Cir. 2012). The employer "has the duty to promulgate and enforce safety rules, and evidence of its failure to do so may be considered by the jury in assessing the employer's negligence in a FELA action." *Ackley v. Chicago & North Western Transp. Co.*, 820 F.2d 263, 268 (8th Cir. 1987). Although the duty to provide a safe ship is broad under the Jones Act, the employer must have notice and the opportunity to correct an unsafe condition before liability will attach. *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir. 1989). There must therefore be some evidence from which the Court can infer that CCM either knew, or in the exercise of due care, should have known of the unsafe condition. *Havens v. F/T Polar Mist*, 996 F.2d 215, 218 (9th Cir. 1993) (citing *Dempsey v. Mac Towing, Inc.*, 876 F.2d 1538, 1543 (11th Cir.1989)).

Jones Act claims have four elements: (1) that the plaintiff is a seaman under the Act, (2) that the plaintiff suffered the injury in the course of his employment, (3) that the plaintiff's employer was negligent, and (4) that the employer's negligence caused plaintiff's injury, at least in part. *McKinney v. Am. River Transp. Co.*, 954 F. Supp. 2d 799, 805 (S.D. Ill. 2013) (citing *Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 451 (4th Cir. 2012); *Martin v. Harris*, 560 F.3d 210, 216 (4th Cir. 2009)). While the first three elements are governed by the normal standards of proof for tort claims, a claimant's burden to prove causation is "very light," requiring only that he or she establish "that the employer's acts or omissions played some part, no matter how small, in producing the employee's injury." *Cella v. United States*, 998 F.2d 418, 428 (7th Cir. 1993) (citations omitted).

First, the parties do not contest that Williams was a "seaman" for purposes of the Jones Act. Second, the Court has determined to its satisfaction that the accident did occur and that Williams suffered injuries in the course of his employment as a deckhand employed by CCM.

Third, as previously discussed in the Findings of Fact, the Court has concluded that CCM was negligent in failing to promulgate and enforce adequate safety rules, failing to train its employees with respect to laying wire between barges, and failing to adequately crew the *Stacy Dianne* for the task assigned to Williams on October 22, 2014. The Court further finds that CCM had adequate notice of these unsafe conditions and opportunity to correct them.

Finally, the Court finds that CCM's negligence caused or at least contributed to cause Williams' injury. The lack of a second deckhand contributed to the wire slipping off the button and injuring Williams. And the failure to train Williams in recognizing potential rigging hazards and other safety procedures contributed to his inability to recognize a dangerous situation which resulted in his injuries.

Under maritime law, contributory negligence by the injured seaman may reduce his recovery for damages under the Jones Act when his negligence causes injury. *Perkins v. American Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 598 (6th Cir. 2001). The standard for contributory negligence is the same as for employer negligence: whether the crewmember's negligence was a cause, in whole or in part, even in the slightest, of his or her injuries. *Norfolk Southern Ry. Co. vs. Sorrell*, 549 U.S. 158 (2007).

The Court finds no evidence to support a finding of contributory negligence by Williams. There is no indication that Williams failed to exercise ordinary care in performing the duties asked of him by CCM in accordance with the training and rules he had been provided. In fact, CCM's own expert found no fault with Williams' actions. Nor is there any indication that Williams was impaired in performing his duties by his use of Suboxone.

**Unseaworthiness**

"Unseaworthiness is a claim under general maritime law based on the vessel owner's duty to ensure that the vessel is reasonably fit to be at sea." *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441 (2001). The doctrine of unseaworthiness "contemplates that a ship's hull, gear, appliances, ways, appurtenances and manning will be reasonably fit for its intended purpose." *Moreno v. Grand Victoria Casino*, 94 F. Supp. 2d 883, 890–91 (N.D. Ill. 2000) (quoting M. Norris, THE LAW OF SEAMEN, § 613 at 169 (3d ed. 1970 & Supp.1979)). "The warranty of seaworthiness is a doctrine of liability without fault." *Gaddis v. Orgulf Transp. Co.*, 680 F. Supp. 1279, 1282 (S.D. Ill. 1988) (citing *Seas Shipping Co. v. Sieracki*, 328 U.S. 85 (1946)). A ship owner has an absolute and non-delegable duty to furnish a seaworthy vessel and appurtenances that are reasonably safe and fit for their intended use. *Id.* (citations omitted).

To succeed on an unseaworthiness claim, a seaman "must show that an unsafe condition on the vessel caused his injury[.]" *Hughes v. ContiCarriers & Terminals, Inc.*, 6 F.3d 1195, 1197 (7th Cir. 1993) To establish proximate cause, "a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." *Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1354 (5th Cir. 1988). Negligent orders, insufficient crew members and assigning too few crew members to a job may deem a vessel unseaworthy. *Moreno*, 94 F. Supp. 2d at 891 (citations omitted). Similar to Jones Act negligence, the proportionate negligence of the crewmember applies to reduce any damages awarded him or her under the doctrine of unseaworthiness. *Scott v. Fluor Ocean Services, Inc.*, 501 F.2d 983, 984 (5th Cir. 1974).

The Court finds that the *Stacy Dianne* was unseaworthy, in that it was assigned too few deckhands to safely perform the job Williams was asked to do. Kinked wires are a known

hazard of laying and tightening wires, and using a second deckhand to ensure the wire does not jump off the button is a "safety standard." The lack of a second deckhand and the lack of adequately trained first deckhand were proximate causes of the accident. Similarly, the Court finds no contributory negligence to reduce CCM's liability, as described above. .

## Maintenance and Cure

"General admiralty law entitles an injured seaman to maintenance (shelter until he recovers) and cure (treatment), plus lost wages—all irrespective of any negligence on his part— and, if his injury was caused by the unseaworthiness of the ship on which he was injured, to damages comparable to those available in a nonmaritime personal injury suit," subject to the partial defense of comparative negligence. *Deering v. National Maintenance & Repair, Inc.,* 627 F.3d 1039, 1041 (7th Cir. 2010).

"Maintenance" is "the payment by a shipowner to a seaman for the seaman's food or lodging expenses incurred while he is ashore as a result of illness or accident." *Barnes v. Andover Co.*, 900 F.2d 630, 631 (3d Cir.1990). "Cure" is "the right to necessary medical services." *Guevara v. Maritime Overseas Corp.*, 59 F.3d 1496, 1499 (5th Cir. 1995) (*en banc*). Liability for maintenance and cure "extends during the period when [the seaman] is incapacitated until he reaches the maximum medical recovery." *Vaughan v. Atkinson*, 369 U.S. 527, 531 (1962). When there are ambiguities or doubts, they are resolved in favor of the seaman on maintenance and cure issues. *Id.* at 532 (citing *Warren v. United States,* 340 U.S. 523 (1951)).

Upon receiving a claim for maintenance and cure, the shipowner "need not immediately commence payments; he is entitled to investigate and require corroboration of the claim." *Morales v. Garijak, Inc.*, 829 F.2d 1355, 1358 (5th Cir. 1987). If, after investigating, the shipowner unreasonably rejects a meritorious claim, the owner becomes liable for the maintenance and cure payments as well as compensatory damages. *Id.* "These are the damages

that have resulted from the failure to pay, such as the aggravation of the seaman's condition, determined by the usual principles applied in tort cases to measure compensatory damages." *Id.* Courts have also allowed recovery of attorneys' fees attributable to enforcing or obtaining maintenance and cure if the shipowner's delay or refusal is "callous" and "willful and persistent" refusal to pay maintenance and cure. *Atl. Sounding Co. v. Townsend*, 557 U.S. 404, 417 (2009) (citing *Vaughan v. Atkinson*, 369 U.S. 527 (1962)).

Under maritime law, an employer is absolved from paying maintenance and cure when an employee misrepresents his or her medical status when seeking employment. See *McCorpen v. Central Gulf Steamship Corp.*, 396 F .2d 547, 549 (5th Cir. 1968).[4]  To succeed on a *McCorpen* defense, a defendant must show that 1) the employee "intentionally misrepresented or concealed medical facts," 2) those facts were "material" to the employer's decision whether or not to hire the employee, and 3) there exists a nexus between the information withheld and the injury incurred. *Brown v. Parker Drilling Ofshore Corporation*, 410 F.3d 166, 170 (5th Cir. 2005).  In the nondisclosure context, "the defendant must prove that the Williams subjectively believed that her employer would deem her medical condition a matter of importance." *Meche v. Doucet*, 777 F.3d 237, 245 (5th Cir. 2015).

Here, the Court finds that Williams was entitled to maintenance and cure as a result of his injuries, and that he is entitled to recover the unpaid amount of medical bills as cure.  CCM does not challenged the authenticity of the bills, and the Court finds that the procedures were reasonably related to the treatment of the injuries sustained by Williams in the course of his employment.

Moreover, the Court finds that Williams's right to maintenance and cure are not compromised by his failure to inform CCM of his prior history of back injuries under *McCorpen*.

---

[4] Originally, the law held that "when a seaman enters into his contract of service, there is always implied as a warranty that he is fit, bodily and mentally, for the station for which he contracts."  *The Mary Sanford*, 58 F. 926, 926 (E.D. SC 1893).  This doctrine has been functionally superseded by its modern descendent, *McCorpen*.

It is undisputed that Williams had complained of back pain on a number of occasions prior to the accident and had even received a workers' compensation rating of 11 percent total permanent disability due to back issues. However, there is no indication in the record that Williams "intentionally misrepresented or concealed" the condition from CCM. Indeed, CCM never inquired as to Williams' medical or injury history.

Williams' testimony suggests that at the time he hired on with CCM, he had a good-faith belief that he could actually physically perform the work they would be asking him to do. As such, and given the liberality with which courts treat a seaman's maintenance and cure claims, there is no basis to reduce or deny Williams' claims on the evidence before the Court.

The Court also concludes that the delay in payment of maintenance and cure merit an additional award of attorneys' fees. CCM was entitled to reasonably investigate whether the accident actually occurred, and the Court finds the delay in paying maintenance was reasonable until Williams' attorney provided the requested information on his actual living expenses. Relatedly, while CCM was receiving the initial wave of medical records incurred due to the accident, it was reasonable to wait to begin payment until they had been received and investigated. However, CCM's attorney represented in his March 25, 2015 letter that it was accepting responsibility for Williams' medical bills related to the accident. But it appears that no medical bills were paid until October 8, 2015 and that there remain bills outstanding.

CCM offered no explanation for the delay and failure to pay. In fact, the corporate representative was unaware at his deposition that any bills remained unpaid. While the company may have delegated the issue to "the insurance company and the attorney," it remains CCM's responsibility and liability. Such conduct amounts to callousness and willful persistence. Therefore, the Court will award Williams attorneys' fees related to the late-paid and unpaid medical bills.

**Damages**

Based on Dr. Summary's calculation of past lost wages, **Williams is AWARDED $87,727 in lost wages and $11,863 in lost fringe benefits.**

The Court also finds Dr. Summary's calculated present cash value of future wages and fringe benefits assuming minimum wage employment to be a credible and a reasonable measure of Williams' future economic damages. Accordingly, Williams is **AWARDED future wage loss in the amount of $298,582 and future lost fringe benefits in the amount of $131,167.**

The Court further **AWARDS** Williams damages for **past pain and suffering in the amount of $300,000 and future pain and suffering in the amount of $200,000.** While there is some evidence that Williams will be at a higher risk for further back injuries and may require additional surgery at some later point, the evidence was not sufficiently definite to support an award of future medical expenses.

The evidence shows unpaid medical bills of **$216,227.55. This amount is AWARDED to Williams as unpaid cure.** The Court finds that in the circumstances presented by this case, attorneys' fees for CCM's delay and failure to pay cure are appropriate. However, counsel's request for 40% of the unpaid medical bills and one-third of the medical bills that were paid appears excessive Attorney's fees for callous and indifferent refusal to pay maintenance and cure must be limited to fees incurred for prosecuting the maintenance and cure claims. In *Williams v. Kingston Shipping Co., Inc.*, 925 F.2d 721 (4th Cir. 1991), "The [district] court properly recognized that no fee should be allowed for work exclusively devoted to the two Jones Act claims and the unseaworthy claim." *Id*. at 724. Accordingly, Plaintiff's Counsel is **DIRECTED** to submit separate documentation to support attorneys' fees on a lodestar basis.

Finally, Williams is entitled to prejudgment interest on portions of the overall award. "Under the Jones Act, recovery of prejudgment interest is not permitted. However, as a general

rule, prejudgment interest may be awarded in admiralty cases—not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled. This general rule is limited by the proposition that a seaman may receive prejudgment interest for past but not future damages." *Am. River Transp. Co. v. Phelps*, 189 F. Supp. 2d 835, 854 (S.D. Ill. 2001) (citations omitted). The Court attributes half the past lost wages and fringe benefits ($49,795) to the unseaworthiness claim and awards prejudgment interest on that and the unpaid cure.

In this case, the Court finds the average of the prime interest rate to be appropriate. See *Cement Div., Nat'l Gypsum Co. v. City of Milwaukee*, 144 F.3d 1111, 1113 (7th Cir. 1998) (using the prime rate for prejudgment interest). As a result, the Court **AWARDS Williams prejudgment interest of 4**% beginning on the incident date to today, totaling $36,703.82.

## <u>CONCLUSION</u>

Judgment will be entered in the amount of **$1,282.270.37** in favor of Timothy Williams and against Defendant Central Contracting and Marine, Inc. in accordance with this Memorandum and Order. Further, Williams is awarded costs and shall file a petition for the same within 30 days from the entry of this Order.

**IT IS SO ORDERED.**

**DATED: April 3, 2018**

**s/ Staci M. Yandle**
**STACI M. YANDLE**
**United States District Judge**
