## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| TIMOTHY W. WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No.:  3:15-cv-867 |
| vs. | ) | |
| | ) | |
| CENTRAL CONTRACTING & MARINE, | ) | |
| INC. | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT CENTRAL CONTRACTING & MARINE, INC.'S
### RESPONSE TO SHOW CAUSE ORDER

### A.    Introduction

The conclusion is inescapable that the plaintiff in this lawsuit, Timothy Williams, by himself and in concert with a key trial witness, Sunil Chand, M.D., perpetrated a fraud on this Court. Part of the fraud involved fabricated testimony by Williams to this Court about his significantly limited post-accident physical activities. The testimony is diametrically opposed to testimony Williams presented in a St. Francois County, Missouri, lawsuit. In short, Williams presented one story to this Court in order to get a large judgment; later he presented a contradictory story in St. Francois County in order to insulate himself from monetary exposure to Sunil Chand, Williams' treating physician, who was a witness in this case, and who was suing Williams for back rent.

The *Chand v. Williams* lawsuit revealed another and even more disturbing aspect of the fraud that was perpetrated on this Court. It is now apparent that the relationship between Williams and Chand was not simply

that of doctor-patient as was represented at trial. Instead, Williams and Chand had a multi-faceted relationship that involved one-time friendship, physical labor by Williams for Chand, real estate transactions, and ultimately, when Williams no longer needed Chand, allegations of betrayal and a lawsuit. On top of all of that, Chand had an undisclosed financial interest in the outcome of the trial in this case.

The evidence that has come to light as a result of the St. Francois County, Missouri proceedings demonstrates that key testimony presented to this Court was fabricated, that Williams engaged the machinery of two different courts to perpetrate fraud, and that Williams and Chand had an undisclosed financial entanglements that included Chand's monetary interest in the outcome of this case, in which he was a key witness. The circumstances broke the guardrails that normally protect the adversarial process, and they no doubt impacted the outcome of the case. The Court's judgment must therefore be vacated and appropriate remedial action taken.

**B.     Facts**

1. Williams Misled this Court Regarding His Physical Limitations.

This is a personal injury lawsuit in which the physical limitations resulting from plaintiff's back condition were a key issue. This is how Williams described it in colloquy with his lawyer at the trial of this case on February 14, 2017:

> Q. Now, Tim, I also want to ask you about some
> household duties. Are there things around your house that
> you can't do now that you used to do, be able to do
> before?

A. Maybe like mow the yard or something like that.
I'm just pretty careful anymore about doing a lot of
things.

Q. Did you used to do home repairs around your house?

A. Yes.

Q. Can you do home repairs now?

A. Light duty stuff, yes.

Q. So, for example, you could change a doorknob?

A. Oh, yeah.

Q. Could you hang drywall?

A. No.

Q. Did you used to do car repairs?

A. Some, yes.

Q. Can you do car repairs now?

A. Light stuff probably, yes.

* * *

Q. Are you able to carry groceries?

A. Yes.

Q. And let me qualify this. If you went to Schnucks
and bought groceries, could you carry them?

A. As long -- yes, I think I could.

Q. As long -- now, if you went to Sam's and bought a
box of something, could you carry that?

A. I'm not supposed to, no.

(Tr. pp. 273-74).

This testimony flies in the face of allegations and testimony Williams presented to the St. Francois County, Missouri Circuit Court in defense of a lawsuit for back rent initiated by Sunil Chand, M.D. and in which Williams claimed he owed no rent because of extensive physical labor he performed for Chand in exchange for housing:

> 2.      That on or about May 1, 2016, and thereafter, Plaintiffs requested of Defendant that Defendant provide to Plaintiffs certain valuable services, labor, maintenance and repair at various locations at properties and businesses either owned, controlled or operated by Plaintiffs, including but not limited to the following locations:
>
> > a)  503 Emerson Ave, Park Hills, MO:
> > b) 1031 E. Karsch Blvd., Farmington, MO
> > c) 112 Union St., Park Hills, MO;
> > d) 300 Holly Rock St., Farmington, MO;
> > e) 763 6th St., Park Hills, MO;
> > f) 925 Union Place, Herculaneum, MO;
> > g) 609 N. Truman Blvd., Festus, MO;
> > h) 7540 Lynn Ave, University City, MO
>
> 3.      That in compliance with Plaintiff's requests as aforesaid, Defendant provided said services, labor, maintenance and repair to Plaintiffs.
>
> 4.      That the reasonable and full value of the benefit and services rendered to Plaintiffs by Defendant as aforesaid is $22,760.00.

(Williams' Counter-Petition, Count I, *Sunil and Nilma Chand v. Timothy Williams,* No. 18SF-AC01667, St. Francis County, Missouri Circuit Court, Ex. A hereto).

Williams testified that the labor included building a deck, using a chainsaw, painting, cleaning, building a brick retaining wall, replacing drywall, and tearing out shingles. (Transcript in *Chand v. Williams,* pp. 130-136, Ex. B).

All of this work took place prior to Williams' testimony to this Court in which he said he could not mow his own lawn or carry a large box. Williams kept a log book purporting to document his work. He claims to have mowed over **55 yards** for Chand and spent over **128 hours** doing so prior to and in the months following his testimony in the trial of this case. (Ex. A from *Chand v. Williams* (Ex. C hereto) and Transcript, pp. 203-04). It is hard to imagine more brazen lying.

2.    Chand's Financial Interest in the Outcome of the Trial in this Case.

This is what Sunil Chand told this Court about the nature of his relationship with Williams:

Q. How do you know him?

A. As a patient.

(Tr. p. 92). It seemed like completely believable and innocuous testimony at the time, and it was utterly inaccurate and deceptive. And no one, not undersigned counsel, nor surely the Court, would have any reason to question the testimony at the time. Doctors treat patients and there was no reason to suspect anything different between Chand and Williams. But as was laid bare in the Missouri state court litigation, the relationship was considerably more complicated than merely that of doctor and patient, involving one-time friendship, a landlord/tenant relationship, physical labor by Williams for Chand, and an expectation by Chand to benefit financially from the outcome of this lawsuit.

Williams moved into Chand's property, located at 503 Emmerson Avenue, in Park Hills, MO, on May 11, 2016. (Tr., *Chand v.* Williams, p. 126). On May 16, Williams signed a lease in which he agreed to pay rent in the amount of $585 per month to Chand. (Ex. 1 From *Chand v. Williams*, Ex. D hereto).

In August, 2016, Chand and Williams made an agreement whereby Williams would purchase the Emmerson Avenue property from proceeds from this lawsuit. (Ex. X from *Chand v. Williams* (Ex. E hereto) and Tr. 112). According to Williams, Chand demanded that the agreement be put in writing. (*Id.* p. 117). As a consequence, Chand acquired a financial interest in the outcome of this litigation (*Chand v. Williams* Tr. p. 43). Williams testified that once the agreement was in place, Chand really wanted him to get the money and "would not shut up about it. He wanted that 70,000." (*Id.* p. 119). Once the judgment was entered in this case, and Williams received the net amount due him, Williams said Chand was "chomping at the bit" and "was wanting a big chunk of my money that I received, and he wanted me to buy pretty much all the dilapidated houses that they owned . . . [.]" (*Id.* p. 190).

In addition, Williams claimed that he owed no rent to Chand because they agreed that in lieu of rent, Williams would perform physical labor. Williams testified that when he moved into the Emmerson property it had "major problems" (Tr. 115) that Williams addressed by taking four loads of trash to the dump, replacing the floor, painting, replacing ceiling fans, and

putting in a new refrigerator and stove. (*Id p.* 116). He also built a patio with 400 bricks. (*Id.* p. 153).

In addition to the Emmerson property, Williams says he performed physical labor at seven other properties. Williams said the work was performed in lieu of rent. It included fixing potholes by shoveling gravel, building a deck, fixing a brick retaining wall, replacing drywall, and tearing out wood.

### 3. Williams provided false information about his address.

When Williams answered interrogatories for this case in February, 2015, he stated he lived at an address in Farmington, Mo. (Defendant's Ex. 1 from the trial of this case). On the eve of trial, in February, 2017, he provided supplemental answers that continued to show him living at the address in Farmington, Missouri. (Ex. F hereto, p. 2-3). According to the testimony and exhibits in the *Chand v. Williams* lawsuit, this answer was false.

### 4. Williams provided false information about his rent.

CCM propounded an interrogatory to Williams regarding his monthly expenses, in order to determine the appropriate daily rate of maintenance. Williams stated, under oath, that he paid rent in the amount of $680 per month. He provided this answer in his initial answers in February, 2015, and his supplemental answers in February, 2017. According to testimony in *Chand v. Williams*, Williams stopped paying any rent sometime in the summer of 2016. (*Chand v. Williams* Tr. p. 112). During the course of Williams' treatment, and until he reached maximum cure, CCM made $26,327.99 in maintenance

payments based in part on Williams' representations concerning rent (Defendant's Trial Ex. 44).

### 5.    Williams provided false information about his post-accident work.

CCM also sought information about Williams' post-accident work. In his initial interrogatory answers in 2015, and his supplemental answers on the eve of trial, Williams said he had not worked because he had not been released:

> 15. Describe all positions of employment or self-employment you have held **after** your alleged injury referred to in your Complaint, including the name and address of each employer, the beginning and ending dates of each employment, your job title, your duties, your wage or salary, the name of your immediate superior, and the reason for the termination of each such employment.
>
> **ANSWER:** I have not been employed since the date of my injury. Dr. Gornet has not released me to return to work at this time.

(Defendant's Trial Ex. 1, and Ex. F hereto).

Plaintiff will no doubt quibble with the notion that his work for Chand constituted "employment." But he also told this Court that following his accident while working for CCM in 2014, he did not "work." (Tr. p. 268). Regardless of how Williams' activities are characterized, according to his testimony in the *Chand v. Williams case*, Williams performed extensive labor for Chand in exchange for something of monetary value, i.e. a place to live. He should have disclosed this information in his interrogatory answers and his failure to do so is consistent with a pattern of deceit by Williams that prevented CCM, and the Court, to learn about his financial relationship with Chand and the substantial physical labor he was performing. And his denial to this Court regarding having worked was misleading at best.

<u>6.     Williams claimed yet another back injury and threated to sue
Chand over it.</u>

According to documents and testimony in *Chand v Williams,* Williams

claims to have sustained *another* work-related back injury in February, 2018

while doing work for Chand.[1]

> "To Dr. -- Tim to Dr. Chand: Above all, I thought we were good
> friends. It really hurts my feelings that not only were you trying to
> take advantage of me financially, but you also have ignored me in
> the fact that I hurt my back in February when we were working on
> that building in Festus. I've been telling you over and over that I'm
> in a lot of pain since I fell up there and you told me over a
> week ago to get an X-ray, but every place I went said I had to have
> a doctor's order. So I waited and waited to hear from you. You have
> proven that you could care less if I'm hurt or not. I'm going to call
> the surgeon that did my back and see what to do. It
> really makes me mad that I told you over and over and you can't
> deny while I worked that I had a restriction on my back and could
> not lift over 20 pounds and was not supposed to bend repeatedly
> and so on. But yet, you kept putting me in harm's way
> and pushing me to work harder. When I fell that day, you or your
> wife didn't even ask if I was okay. Unfortunately, if there is any
> damage to the disk in my back you will be held accountable, I can
> tell you that. And with that being said, from here on out do not
> contact me from this day forward. If you have questions, you can
> call my attorneys. One more thing I want to get off my chest. I
> worked my ass out for you for about a year, one a and a half years,
> yardwork, painting, your flea market, cleaned out storage units,
> fixed lights, buffed floors, et cetera, not to mention was a drug
> counselor, sometimes had to walk and catch a ride to work, all this
> and you did not even pay me. Thank God there are laws protecting
> me from people like you and your wife. I have never met more
> dishonest, cheating people in my life. And with ending,
> I am not going to allow you to rip my mother off that car. Sorry,
> she's not going to pay you eight times what you paid for it. The car
> is parked at 503 Emerson, keys and title inside. My lawyer -- I
> don't know who that is -- told me to take pictures of everything so
> you can't try to pull something. I'm going to say this one more time
> so it sinks in. Do not -- do not have anybody from your office
> contact me from now on."

---

[1] This is the fifth occasion in which Williams has filed or threatened to file a claim for a work-related back injury.

(*Chand v. Williams Tr.,*  pp. 192-193).

### 7. Williams' False Testimony Was Material.

In its show cause order (Doc. 79), this Court noted that it credited the testimony of Williams and Chand, and after doing so awarded damages including for past and future pain and suffering and unpaid medical bills. After assessing the evidence presented at trial, the Court awarded $300,000 for past pain and suffering, and $200,000 for future pain and suffering. The Court also awarded lost future wages of $298,582, and future fringe benefits of $131,167. The total award was $1,282,270.37. (Doc. 74, pp. 25-26). The court specifically noted Williams' testimony about his post-accident physical limitations (*Id.* at 16).

Williams' trial testimony concerning his physical limitations was directly material to the items of damages discussed above. And there is no doubt that Williams' testimony was tainted by fraud. Either he was exaggerating his limitations to this Court, or he was exaggerating his abilities to the St. Francois County, Missouri Circuit Court. The testimony provided in the two venues is irreconcilable. Apart from the fact that the proceedings in St. Francois County demonstrate that Williams is anything but a credible witness, it is hard to fathom that had this Court known Williams was mowing lawns, hanging drywall, building brick patios and decks, etc., and doing so as part of an arrangement to obtain rent-free housing, the damage awards set forth above would be what they were.

### 8. Chand's Financial Interest Was Material.

Sunil Chand presented critical evidence for Williams, under the guise that he was simply a treating doctor, to support the notion that Williams was not impaired by Suboxone at the time of his accident (thus negating contributory fault on the part of Williams) (Tr. 109-111; 115); and that because of *pain*, Williams would be required to take Suboxone for the rest of his life (Tr. 147-48). Williams seems to have appreciated how important Chand was. He told the St. Francois County Circuit Court that Chand testified in this lawsuit that "the medicine that I was taking at the time would not have . . . played into that accident . . . [.]" (*Chand v. Williams,* Tr. 111).

In assessing liability, this Court noted "Nor is there any indication that Williams was impaired in performing his duties by his use of Suboxone." (Doc 74, p. 20). It appears this conclusion was affected by the Court's decision to credit Chand's testimony, and it is also apparent that Chand's testimony regarding plaintiff's pain and the need to treat it with life-long medication was material to the Court's determinations regarding pain and suffering.

### 9. Williams' False or Misleading Discovery Responses and Other Actions were Material.

Plaintiff provided false interrogatory answers regarding his address and the amount of rent he was paying. Although this information was not presented to the Court to affect the outcome at trial, plaintiff's false answers were part of a pattern of deception that prevented CCM and the Court from learning about his real estate connections with Chand. And had that connection become known, then CCM would have learned about the extensive physical labor

Williams was performing for Chand, work that was completely at odds with the false picture Williams presented to this Court. And Williams claimed in interrogatory answers and in testimony that he did not work following his accident. Yet he told the Court in St. Francois County, Missouri, through testimony and documents, that he performed substantial amounts of physical labor for Chand.

C.     Applicable Law

The ability to address and remedy a fraud perpetrated on the court is an historic equitable power that this Court possesses in order to maintain judicial integrity and correct fraudulent proceedings as justice demands. The Supreme Court addressed the doctrine in the seminal case *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944). *In Hazel-Atlas*, the defendant ghost-wrote an article beneficial to its application for a patent, received a patent from the Patent Office, and later used the article in a patent infringement case against the plaintiff. *Id.* at 240-41. After the ghost-writing scheme was uncovered nearly ten years later, the plaintiff asked the court to set aside the original judgment against it. *Id.* at 239. The Supreme Court recognized that, in most instances, cases would not be vacated because of "the belief that . . . society is best served by putting an end to litigation after a case has been tried and judgment entered." *Id.* at 244. However, the Court held in that instance the fraud "demand[ed] the exercise of the historic power of equity to set aside fraudulently begotten judgments" because the defendant had a "deliberately

planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals." *Id.* at 245.

Current Seventh Circuit jurisprudence holds that "'[f]raud on the court' . . . consists of acts that 'defile the court.'" *In re Golf 255, Inc.*, 652 F.3d 806, 809 (7th Cir. 2011) (citing, inter alia, *Drobny v. Commissioner*, 113 F.3d 670, 677–78 (7th Cir.1997). The Seventh Circuit outlines two species of 'fraud on the court': (1) "fraud which does, or attempts to, defile the court itself," or, (2) "fraud perpetrated by officers of the court [i.e., lawyers] so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases.'" *Golf 255* at 809 (quoting *Kenner v. Commissioner*, 387 F.2d 689, 691 (7th Cir.1968). A key characteristic distinguishing fraud on the court under Rule 60(d)(3) from more general fraud that can be remedied under Rule 60(b) is that fraud on the court "ordinarily couldn't be discovered, despite diligent inquiry, within a year, and in some cases within many years – cases in which there are no grounds for suspicion and the fraud comes to light serendipitously." *Id.* at 809.

In general, fraud on the court is conduct that rises "to the level of an 'unconscionable plan or scheme . . . designed to improperly influence the court in its decision." *Kenner*, 387 F.2d 689, 691 (7th Cir. 1968). Lastly, because Rule 60(d)(3) is used to amend or vacate judgments sometimes years after they were entered, the party wishing to show fraud on the court has to demonstrate it by "clear and convincing evidence." *Wickens v. Shell Oil Co.*, 620 F.3d 747, 759 (7th Cir. 2010).

Fraud that implicates the judicial machinery of multiple courts may also rise to the level of fraud on the court. *See Wildcat Enterprises, LLC v. Weber*, 322 F.R.D. 306 (N.D. Ill. 2017). For example, in *Wildcat Enterprises*, the U.S. District Court for the Northern District of Illinois vacated a judgment pursuant to Rule 60(d)(3). *Id.* at 311-12. The party opposing vacatur were debtors pursuant to a consent judgment. *Id.* at 307. Subsequent to the consent judgment, and unknown to the court, the debtors instructed their respective spouses to form an LLC, Wildcat Enterprises, and purchase the judgment from the original plaintiff. *Id.* The debtors then transferred assets to Wildcat in apparent satisfaction of the judgment. *Id.* The court described the scheme as the `debtors "merely giving with one hand and receiving with the other." *Id.* at 310. Moreover, Wildcat intervened in separate state court actions against the debtors and "persuaded the state courts that its claims to the [debtors'] assets were superior" to other creditors'. *Id.* at 307. In holding these actions constituted a fraud on the court, the Northern District of Illinois reasoned (1) the fraud could not have reasonably been determined at the time the order was entered because based on the debtors and Wildcat's representations, there was no reason to suspect that they were in collusion; (2) the scheme involved a subversion of the judicial process itself because the parties "did not merely deceive this court, they went on to . . . deceive other courts into holding that Wildcat had a superior interest in the judgment." *Id.* at 311.

D.    Discussion

The facts in this case establish a fraud on this Court. The fraud arises not simply by virtue of Williams' false testimony, brazen as it was. It arises also because Williams engaged the machinery of two courts to benefit from perjured testimony. In this Court, he told a story about significant limitations impacting his daily activities. He could only do light household repairs. Mowing a lawn was too much. He couldn't carry a box, and hanging drywall was out of the question. Of course, this was a personal injury lawsuit in which Williams expected his story about diminished physical activities would translate to a large judgment.

But the tables turned when Sunil Chand sued Williams. In that case, to defeat a judgment for back rent, Williams claimed no rent was owed because he had an arrangement to perform physical labor in exchange for housing. He produced a logbook purporting to document, and provided extensive testimony about, the physically demanding work he did for Chand. And it was exactly the kind of work Williams told this Court he could not do: mowing, hanging drywall, moving heavy objects. He built decks and brick retaining walls for good measure. Although it is unclear which version of Williams' physical abilities is true, one thing is clear: Williams has no regard whatsoever for the oath he took upon assuming the witness stand.

Chand, meanwhile, was a key witness in this case. He painted a sympathetic picture of a plaintiff who had turned his life around after opioid addiction, a plaintiff whose life will be so impacted by pain that Chand said he

required a life-long prescription for a drug that mimics the effects of opioids. Yet, if Williams is to be believed, at the same time Chand was prescribing medication for a painful back condition, he was assigning Williams to perform manual labor associated with rehabbing rental properties. The contradictions would be comical were it not for the fact that they were presented to different courts in formal proceedings designed to arrive at just outcomes.

The most troubling part of this case is that Chand was operating under a scheme to profit off of these proceedings. He freely admitted in the St. Francois County Circuit Court that he had a financial interest in the case because he expected to sell one of his properties to Williams for an agreed sum, if Williams was successful in getting a money judgment in this Court. And if Williams is to be believed, Chand had designs on taking virtually all of the money Williams recovered.

This conduct is off the rails. This is not simply a case in which a witness was paid for testimony. It is a case in which the witness's financial reward was *contingent* on a favorable outcome for the party on whose behalf the witness was testifying.[2] The normal expectations around paying expert witnesses for testimony are reflected in the rules. Professionals who render opinions for parties in litigation are normally compensated for their services, and are required to disclose the compensation automatically under Rule 26(a)(2)(B)(vi). But normally this involves compensation tied to an hourly rate. We do not

---

[2] The conduct is in violation of the A.M.A. Code of Ethics, Opinion 9.7.1. "Physicians must not accept compensation that is contingent on the outcome of litigation." ( https://www.ama-assn.org/delivering-care/ethics/medical-testimony).

expect that treating physicians are providing testimony for which they will be paid only if their patient wins. Testimony arising from such an arrangement is so inherently tainted that no one would ever expect such an arrangement to exist in the first place.

Finally, it is worth noting that part of CCM's defense to this lawsuit was built around the notion that Williams was a serial back injury claimant, having previously filed a Jones Act lawsuit, two workers compensation claims, and a Social Security Disability Application, all based on allegations that Williams had significant back injuries. CCM presented testimony from treating doctors Gornet and Mall showing that Williams falsely denied the prior back injuries. It presented testimony from Sherwin Wayne, MD, who, based on comparing pre and post -accident imaging studies, concluded there was no material change to the structures of Williams' lumbar a result of William's alleged accident at CCM. And CCM presented text messages sent by Williams to CCM that showed Williams was threatening a lawsuit and had already hired a lawyer within two days of his alleged accident. (Tr. 313-315; Ex. 5)

> I took you for a stand up guy i was wrong u left me hangin all hurtin man. Sorry i got hurt so much but i did and i was on your boat. . .. other than call a marine lawyer i don't know what else to do on my end.

(Ex. 5).

As a result of the *Chand v. Williams* lawsuit, we see that the pattern is repeating itself:

> Tim to Dr. Chand: Above all, I thought we were good friends. It really hurts my feelings that not only were you trying to take advantage of me financially, but you also have ignored me in the

> fact that I hurt my back in February when we were working on that
> building in Festus. I've been telling you over and over that I'm in a
> lot of pain since I fell up there . . .. Unfortunately, if there is any
> damage to the disk in my back you will be held accountable, I can
> tell you that. And with that being said, from here on out do not
> contact me from this day forward. If you have questions, you can
> call my attorneys.

(*Chand v. Williams* Tr. pp. 192-193).

It is almost as if Williams has a template he uses to set up back injury

claims. He says he falls at work, hurts his back, he texts/emails his employer

that he is hurting really bad, the employer isn't doing what it/he should,

Williams trusted the employer but was wrong to do so, and the employer has

left him no choice to but pursue legal action. CCM submits that the Court

should use the tools afforded by Rule 60(d)(3) to interrupt this pattern of

conduct by Williams.

### E.    Remedies

As the Court is aware, the judgment entered in this case was satisfied in

May, 2019 (Doc. 78). Vacating the judgment, as the Court is authorized to and

should do under Rule 60(d)(3), will not have any immediate monetary impact,

because the funds are already in the hands of Williams and his attorneys, and

possibly others.

Beyond vacating the judgment, the Court has broad equitable powers to

remedy the fraud that has been perpetrated.

> The power to unearth such a fraud is the power to unearth it
> effectively. Accordingly, a federal court may bring before it by
> appropriate means all those who may be affected by the outcome of
> its investigation. . .. [I]f the court finds after a proper hearing that
> fraud has been practiced upon it, or that the very temple of justice

Case 3:15-cv-00867-SMY-RJD   Document 82   Filed 07/20/20   Page 19 of 21   Page ID #1723

has been defiled, the entire cost of the proceedings could justly be
assessed against the guilty parties.

*Universal Oil Products co. v. Root Refining Co.,* 66 S.Ct. 1176, 1179 (1946). The

assessment of the cost of the proceedings includes attorney's fees. *Id.*

Perhaps the most useful equitable tool that the Court can employ under

the circumstances here is to impose a constructive trust on any proceeds from

the judgment. In *Chevron Corporation v. Donziger*, 974 F.Supp. 2d 362 (S.D.

N.Y. 2014), in which the court set aside a judgment obtained by fraud, the

court imposed a constructive trust on proceeds stemming from the judgment.

*Id.* at 640-41. The court cited Judge, later Justice, Cardozo who wrote:

> When property has been acquired in such circumstances that the
> holder of the legal title may not in good conscience retain the
> beneficial interest equity converts him into a trustee. Moore v.
> Crawford, 130 U. S. 122, 128, 9 Sup. Ct. 447, 32 L. Ed. 878;
> Pomeroy, Eq. Jur. § 1053.

*Id. quoting Beatty v. Guggenheim Exploration Co.,* 122 N.E. 378 (N.Y. Ct. App.

1919). The court imposed a constructive trust on a contingency fee of an

attorney who orchestrated a fraud on the court, and also on parties who did

not participate in the fraud but received payments or property as a result of the

judgment. *Id.* at 641.

A constructive trust is simply a means to prevent unjust enrichment. *In*

*re Estate of Feinberg,* 2014 IL App (1st) 112219, *appeal denied,* 8 N.E.3d 1048

(2014).

> In order to impose a constructive trust, it is sufficient that a party
> has received money properly belonging to another under
> circumstances that, in equity, the party ought not be allowed to
> retain. *Suttles v. Vogel,* 126 Ill.2d 186, 193, 127 Ill.Dec. 819, 533

> N.E.2d 901, 904 (1988). It is well established that "[w]hen a person's property has been wrongfully appropriated and converted into a different form, 'equity impresses a constructive trust upon the new form or species of property, not only while it is in the hands of the original wrong-doer, but as long as it can be followed and identified in whosesoever hands it may come, except those of a *bona fide* purchaser for value.' " *Sadacca v. Monhart,* 128 Ill.App.3d 250, 256, 83 Ill.Dec. 463, 470 N.E.2d 589, 593–94 (1984), quoting 4 J. Pomeroy, Equity Jurisprudence § 1051, at 113 (5th ed.1941). "[A] constructive trust may be imposed even though the person wrongfully receiving the benefit is innocent of collusion [citation]. By accepting the property, he adopts the means by which it was procured." *Smithberg v. Illinois Municipal Retirement Fund,* 192 Ill.2d 291, 300, 248 Ill.Dec. 909, 735 N.E.2d 560, 566 (2000).

*Jackson v. Callan Publishing Co.,* 356 Ill.App.3d 326, 334 (1st Dist. 2005).

F.    Conclusion

For the reasons herein stated, the Court should vacate the judgment (Doc. 75) entered herein for fraud upon the Court. Using its equitable powers to remedy the fraud, the Court should impose a constructive trust on all proceeds of the judgment in the hands of all persons holding said proceeds including the plaintiff, Timothy Williams, and his attorneys, and the Court should direct said parties to hold said proceeds in trust for Central Contracting & Marine, Inc. In addition, the Court should permit discovery to permit CCM to trace the proceeds of the judgment, to determine what proceeds remain, whether any other persons are holding said proceeds, and whether there has been any effort to engage in any fraudulent conveyance of any of said proceeds. Finally, the Court should award CCM all of its attorney's fees incurred in defending this motion and the underlying litigation.

Dated July 20, 2020.

Respectfully submitted,

GOLDSTEIN and PRICE, L.C.
and Douglas E. Gossow (06200738)
and Giles B. Howard (6319251)


By:    /s Douglas E. Gossow

One Memorial Drive, Suite 1000
St. Louis, MO  63102-2449
Telephone: (314) 516-1700
Facsimile: (314) 421-2832
doug@gp-law.com
giles@gp-law.com
**ATTORNEYS FOR DEFENDANT
CENTRAL CONTRACTING & MARINE,
INC.**